**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma (jdepalma@litedepalma.com)
Katrina Carroll (kcarroll@litedepalma.com)
Steven J. Greenfogel (sgreenfogel@litedepalma.com)
Mayra V. Tarantino (mtarantino@litedepalma.com)(MT2389)
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858

*Attorneys for Plaintiff*
[Additional counsel on signature page]



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 33-35 GREEN POND ROAD ASSOCIATES, LLC, on behalf of itself and all others similarly situated, | Civil Action No.: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS** |
| BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; CITIBANK NA; CENTRALE RAIFFEISEN-BERENLEENBANK B.A.; CREDIT SUISSE GROUP AG; DEUTSCHE BANK AG; HSBC HOLDINGS PLC; J.P. MORGAN CHASE & CO.; LLOYDS BANKING GROUP PLS; THE NORINCHUKIN BANK; THE ROYAL BANK OF CANADA; THE ROYAL BANK OF SCOTLAND GROUP PLC; TOKOYO MITSHUBISHI UFJ UFJ; UBS AG; AND WESTLB AG, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff 33-35 Green Pond Road Associates, LLC, doing business at 35 Green Pond

Road, Suite D, Rockaway, NJ 07866, on behalf of itself and all others similarly situated, brings

this action for violations of federal antitrust law against defendants Bank of America

Corporation, Barclays Bank PLC, Centrale Raiffeisen-Berenleenbank B.A.; Credit Suisse Group

AG; Deutsche Bank AG, Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC

Holdings PLC, JP Morgan Chase & Co., Lloyds Banking Group PLC, The Royal Bank of

Canada, The Royal Bank of Scotland Group plc, UBS AG, and WestLB AG (collectively,

"Defendants") and alleges as follows:

### NATURE OF CLAIM

1.      This action arises from Defendants' conspiracy to unlawfully manipulate the

London Interbank Offered Rate for the U.S. dollar ("LIBOR") from at least as early as August 1,

2007 through such time as the effects of Defendants' illegal conduct ceased, in violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      As alleged herein, during the Class Period (defined below), Defendants conspired

to and did suppress and manipulate LIBOR throughout the Class Period in restraint of trade.

3.      Owned and administered by the British Bankers Association ("BBA"), LIBOR is

a daily benchmark interest rate based on the trimmed average of interest rates at which

designated contributor banks borrow unsecured funds from other banks in the London wholesale

money market for maturities ranging from overnight to one year.  LIBOR is calculated for 10

different currencies including the U.S. dollar.

4.      Every morning by 11:10 a.m. London time, the individual banks on the U.S.

dollar LIBOR panel send data to Thompson Reuters Group ("Reuters"), a news information

provider reporting what it would cost them to "borrow funds, were [they] to do so by asking for

and then accepting inter-bank offers in reasonable market size, just prior to 11.00 London time."

Reuters makes those rates public, which constitutes the day's LIBOR. Reuters determines LIBOR by discarding the lowest four and highest four of the reported estimates, and calculating the average of the remaining eight.

5.      During the Class Period, Defendants were members of the U.S. dollar LIBOR panel. Pursuant to their illegal conspiracy, Defendants knowingly and purposely submitted borrowing rates to Reuters that were below their true borrowing costs in order to suppress and manipulate LIBOR.

6.      Defendants devised and executed their scheme to manipulate LIBOR in order to benefit their financial positions as counterparties to LIBOR-Based derivatives. Defendants sold these LIBOR-Based derivatives throughout the Class Period, which tied rates to LIBOR. By manipulating LIBOR, Defendants paid lower returns to customers who bought those financial products.

7.      During the Class Period, Defendants manipulated LIBOR through collaborative misreporting of the actual interest rates at which their agents reasonably expected they could borrow funds. Defendants directly caused an artificially lower LIBOR during the Class Period allowing them to unfairly gain income as counter-parties to LIBOR-Based derivatives for investors like the Plaintiff. Notably, the manipulation of US LIBOR affected purchasers of all LIBOR-Based derivatives, whether the purchaser purchased from a defendant bank or from a non-defendant bank. This is so because all banks selling LIBOR-Based derivatives utilize the published US LIBOR rate, artificially fixed by Defendants' conspiratorial acts.

8.      Recent investigations by foreign and domestic governmental agencies have resulted in Defendant Barclays' admission to the manipulation of U.S. dollar LIBOR and LIBOR for other currencies. Defendant Barclays admits conspiring through its derivative traders with

3

traders of other banks to submit misleading LIBOR rates to benefit their direct financial interests. As the Barclays admissions underscore (as more fully described below), these reported US dollar LIBOR rates were unrepresentative of the true LIBOR rates.

9.      Defendants' conspiracy to suppress LIBOR violates Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff and members of the Class suffered damages by purchasing during the Class Period financial products that had rates of return tied to LIBOR ("LIBOR-Based derivatives") set directly by Defendants, as more fully alleged herein.

## JURISDICTION AND VENUE

10.      This action arises under Section 1 of the Sherman Act, 15 U.S.C., § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

11.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

12.      Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to Plaintiff's claims arose in the District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

13.      During the Class Period, Plaintiff 33-35 Green Pond Road Associates, LLC purchased an Interest Rate Swap from TD Bank, N.A. in which the floating rate was tied to US LIBOR as set by Defendants and was injured as a result of Defendants' anticompetitive conduct.

14.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina.

15.     Defendant Bank of Tokyo Mitsubishi UFJ Ltd. ("BTMU") is a Japanese company headquartered in Tokyo, Japan.

16.     Defendant Barclays Bank PLC ("Barclays") is a British public limited company headquartered in London, England.

17.     Defendant Citibank, N.A. ("Citibank") is a wholly-owned subsidiary of the United States financial services corporation Citigroup, Inc., which is headquartered in New York, New York.

18.     Defendant Cooperative Centrale Raiffeisen-Berenleenbank B.A. ("Rabobank") is a financial services provider headquartered in Utrecht, the Netherlands.

19.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

20.     Defendant Deutsche Bank AG ("Deutsche Bank") is a financial services company headquartered in Frankfurt, Germany.

21.     Defendant HSBC Holdings PLC ("HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters in London, England.

22.     Defendant J.P. Morgan Chase & Co. ("JPMorgan") is a Delaware financial holding company headquartered in New York, New York.

23.     Defendant Lloyds Banking Group PLC ("Lloyds") is a United Kingdom public limited company with its corporate headquarters in London, England.  Lloyds was formed in 2009 through the acquisition of HBOS PLC ("HBOS") and Lloyds TSB Bank plc ("Lloyds TSB").

24. Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan.

25. Defendant The Royal Bank of Canada ("RBC") is a Canadian company headquartered in Toronto, Canada.

26. Defendant The Royal Bank of Scotland Group plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.

27 Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.

28. Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany.

29. Defendants Bank of America, MTMU, Barclays, Citibank, Rabobank, Credit Suisse, Beutsche Bank, HSBC, JPMorgan Chase, Lloyds, HBOS, RBC, Norinchukin, RBS, UBS, and WestLB were members of the BBA's U.S. dollar LIBOR panel during the Class Period

## UNNAMED CO-CONSPIRATORS

30. Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of and performed acts and made statements which aided and abetted and furthered the unlawful conduct alleged herein.

## THE RELEVANT MARKET

31. The relevant market is LIBOR-Based derivatives.

## DEFINITIONS

32. LIBOR-Based Instruments are Derivative Instruments and Non-Derivative Instruments. LIBOR-Based Instruments may be indexed to one or more LIBOR currencies (*i.e.*,

6

USD-LIBOR, Yen-LIBOR, and Euro-LIBOR).  Only LIBOR-Based Instruments that were sold

in over-the-counter transactions as Derivative Instruments are at issue in the Complaint

(hereinafter "LIBOR-Based Derivative").

33.    Derivative Instruments include but are not limited to asset swaps, collateralized

debt obligations, credit default swaps, forward rate agreements, inflation swaps, interest rate

swaps, total return swaps, cross currency swaps, and options.

## CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated.  The

"Class" is defined as:

>            All persons or entities other than Defendants and their
>            employees, affiliates, parents, subsidiaries or co-
>            conspirators (whether or not named in this Complaint) who
>            purchased U.S. dollar LIBOR-Based Derivatives from the
>            following non-Defendant commercial banks and insurance
>            companies in the United States (Wells Fargo & Company;
>            Goldman Sachs Group, Inc.; Morgan Stanley; Metlife, Inc.;
>            U.S. Bancorp; The PNC Financial Services Group, Inc.;
>            The Bank of New York Mellon Corporation; Capital One
>            Financial Corporation; Ally Financial Inc.; Suntrust Banks,
>            Inc.; BB&T Corporation; TD Bank US Holding Company;
>            State Street Corporation; Citizens Financial Group, Inc.;
>            American Express Company; Regions Financial
>            Corporation; Fifth Third Bancorp; Keycorp Cleveland;
>            Unionbancal Corporation; Northern Trust Corporation;
>            Bancwest Corporation; M&T Bank Corporation; Harris
>            Financial Corp.; and BBVA USA Bancshares, Inc. as well
>            as any of their subsidiaries or affiliates) based directly on
>            the rates set by Defendants, from at least as early as August
>            1, 2007 through such time as the effects of Defendants'
>            illegal conduct ceased.

35.    The Class is so numerous that joinder of all members is impracticable.  While the

exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and

believes that at least thousands of geographically dispersed Class members purchased LIBOR-Based Derivatives based on rates set directly by Defendants during the Class Period.

36.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the antitrust laws as alleged herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

38.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants conspired with others to artificially suppress LIBOR in violation of the Sherman Act;

(b)     Whether Defendants' conduct had an anticompetitive and manipulative effect on LIBOR during the Class Period;

(c)     Whether Defendants' conduct negatively affected the rates of return of LIBOR-Based derivatives based on rates set directly by the Defendants during the Class Period; and

(d)     The appropriate measure of damages for the injury sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

39.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

40.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

I.     **Background**

   A.     **Overview of LIBOR**

41.     Administered and owned by the BBA, LIBOR is a daily benchmark interest rate based on the trimmed average of interest rates at which designated contributor banks borrow unsecured funds from other banks in the London wholesale money market for maturities ranging from overnight to one year.  LIBOR is calculated for 10 different currencies including the U.S. dollar.

B.      **LIBOR-Based Derivatives**

42.     LIBOR is the primary benchmark for short-term interest rates globally.

43.     According to the BBA, "the objectivity and accuracy of the [LIBOR] rates allowed derivatives to be created based on the data as a reference, and this has flourished to become an enormously successful cornerstone of business transacted in London and worldwide."

44.     The perceived integrity of LIBOR allows many derivative products to be priced based on LIBOR. About $350 trillion worth of financial products globally reference LIBOR. To the extent that LIBOR is mispriced, these derivatives are also mispriced.

II.     **Defendants Unlawfully Conspired to Suppress and Manipulate LIBOR**

45.     In August 2007, LIBOR noticeably began behaving erratically. Overnight, LIBOR began a period in which it dramatically decoupled from other financial indicators that had historically functioned as benchmarks. Reports initially assumed that low liquidity and increased credit risk endemic to the financial crisis were the likely contributing factors to the aberrant behavior of LIBOR. Subsequent examination and recent disclosures establish that Defendants were conspiring to artificially manipulate LIBOR to the benefit of their own positions in LIBOR-Based derivatives.

46.     As set forth below, Defendants' conspiracy to manipulate LIBOR throughout the Class Period is evidenced by several forms of analysis. During the Class Period, LIBOR shattered its historical relationships with various economic benchmarks, signifying that it was no longer representative of external market forces and was a result of manipulation by Defendants. Additionally, LIBOR has been shown to respond to external criticism, demonstrating that Defendants intentionally manipulated it, as opposed to reflecting an objective report of market conditions.

47.     An examination of Defendants' LIBOR quotes reveals inconsistencies among Defendants' reporting across currencies and on a day-to-day basis, which supports the fact that Defendants purposefully and collectively agreed to underreport their actual borrowing costs in order to artificially and unlawfully suppress LIBOR.  In so doing, they reaped massive profits from their enormous LIBOR-Based derivatives positions, which directly benefited from their artificial suppression of LIBOR.

48.     Moreover, Defendant Barclays has recently admitted to the U.S. Department of Justice, Commodity Futures Trading Commission, and the United Kingdom Financial Services Authority pursuant to non-prosecution agreements that a multitude of its agents conspired with other banks to manipulate the EURIBOR and the U.S. dollar LIBOR.  These admissions are more fully described below.

A.     **Defendants' Unlawful Manipulation Of LIBOR**

49.     On December 12, 2007, the day after the Federal Reserve cut short-term interest rates for the third time that year in an effort to help ease the credit crunch and reduce the chances of an impending recession, *The Wall Street Journal* ("*Journal*") published an article predicting that continued worry over the credit crisis would effectively keep LIBOR rates high, even as other short-term interest rates would continue to fall.  In fact, the *Journal* quoted one mortgage banker as stating that historically, in times of credit crisis, LIBOR rates have tended to spike.

50.     Pursuant to non-prosecution agreements, Defendant Barclays has admitted to working with agents at other banks to manipulate the U.S. LIBOR prior to the publication of the Journal article.

51.     Despite the Journal's prediction, in the early months of 2008, during the most significant financial crisis since the Great Depression, U.S. dollar-denominated LIBOR rates

submitted by panel banks did not vary markedly, nor did they increase or decrease sharply. This fact did not correspond to traditional market behavior because in times of severe uncertainty, banks would normally be reluctant to lend to one another on an unsecured basis without receiving a higher risk premium.

52.     In a market not artificially manipulated, LIBOR rates should have increased significantly during this period. In addition, because different panel banks were experiencing different levels of economic stress, the panel banks should have been reporting markedly different borrowing rates. None of this was reflected in LIBOR rates reported by Defendants.

53.     On April 16, 2008, the Journal published an article detailing the findings of a three-month study it conducted into the borrowing rates of the 16 banks forming the U.S. dollar LIBOR panel. The Journal concluded that a number of banks - specifically Citibank, WestLB, HBOS, JP Morgan and UBS - had been reporting significantly lower borrowing costs than what other market measures suggest they should have been reporting. The Journal attributed this disparity to certain panel banks intentionally understating their borrowing rates.

54.     The Journal's examination of the borrowing costs submitted by the panel banks during the first four months of 2008 indicated that the panel banks reported remarkably similar borrowing rates despite the fact that the banks were facing different financial stresses. For the first four months of 2008, for example, the three-month borrowing rates reported by the panel banks remained, on average, within a range of only .06 of a percentage point.

55.     According to Professor Darrell Duffie, a Stanford University finance professor, the reported rates during the first four months of 2008 "[were] far too similar to be believed."

56.     David Juran, a statistics professor at Columbia University who reviewed the

Journal's methodology, concluded that the Journal's calculations demonstrate "very convincingly" that reported LIBOR rates are lower than what the market thinks they should be by a factor which well surpassed the threshold statisticians use to assess the significance of a result.

57.     Following the Journal's April 16, 2008 report that the panel banks may be intentionally understating their borrowing rates, the BBA announced it would review LIBOR reporting process and remove any bank found to be reporting inaccurate rates from the panel.

58.     In November 2007 and again in April 2008, the money market committee of the Bank of England raised questions about the integrity of LIBOR. The minutes of the committee's November 2007 meeting stated that, "several group members thought that Libor fixings had been lower than actual traded interbank rates." Minutes from the April 2008 committee meeting noted that "U.S. dollar Libor rates had at times appeared lower than actual traded Interbank rates." Similarly, Citigroup interest-rate strategist, Scott Peng, raised similar questions, writing that "Libor at times no longer represents the level at which banks extend loans to others."

59.     On April 17, 2008, just days after the Journal published its analysis, there was a sudden jump in the U.S. dollar-denominated LIBOR. The benchmark dollar rate for three-month borrowing hit 2.1875% Thursday, or about .08 percentage points more than the 2.735% rate set on Wednesday.

60.     Suspiciously, reported LIBOR rates for other currencies fell or remained relatively flat at the time the U.S. dollar LIBOR surged, a sign that the U.S. dollar LIBOR rate was susceptible to manipulation.

61.     Notably, the significant move in the U.S. dollar-denominated LIBOR closely followed the BBA's announcement that it was accelerating its inquiry into the daily borrowing rates that banks provide to establish LIBOR rate.

62.     Indeed, the BBA's decision to speed up its inquiry was made in response to concerns expressed by bankers and the financial media that certain panel banks were not accurately reporting the rates they were paying for short-term loans.

63.     In a note to clients the day after LIBOR surged, UBS strategist William O'Donnell suggested that the panel banks were responding to the heightened scrutiny, noting that the BBA's announcement of its inquiry was an attempt "to bring publicly posted rates back into line with the shadow interbank money rate market."

64.     At the time, William Porter, credit strategist at Credit Suisse, said he believed the three-month U.S. dollar LIBOR was .4 percentage points below where it should be. That echoed the view of Scott Peng, who concluded that LIBOR understated panel banks' true borrowing costs by as much as .3 percentage points.

65.     Defendants possessed significant financial incentives to manipulate LIBOR, which they did. By suppressing LIBOR, Defendants artificially manipulated the manner in which payments under LIBOR-Based derivatives are calculated to their financial advantage. Illustrating Defendants' motive to artificially suppress LIBOR, in 2009 Citibank reported it would make $936 million in net interest if rates would fall by 25 bps per quarter over the next year and $1.935 billion if they fell 1% instantly. In turn, JPMorgan Chase reported that an increase of 1% would cost the bank over $500 million. HSBC and Lloyds also estimated lower or higher LIBOR rates could mean a cost to the banks of hundreds of millions of dollars.

**B.    Empirical Evidence Confirms Defendants' Manipulative and Conspiratorial Conduct**

66.    One of the unique characteristics of LIBOR's calculation is its opaqueness. The method for LIBOR calculation is only transparent to the extent that each panel bank reports to Reuters its borrowing rate and Reuters publicizes the rates and computes LIBOR. The internal calculations and methodology of the panel banks in determining their borrowing rates are unobservable by the public. This renders LIBOR susceptible to manipulation by Defendants. Since LIBOR is the basis for a large number of daily financial transactions, comparisons to observable market rates have historically been monitored.

67.    In reaction to the media reports of LIBOR manipulation, various empirical studies have demonstrated that the aberrant behavior of LIBOR during the Class Period is suggestive of collective agreement amongst Defendants to manipulate and suppress LIBOR. During the Class Period, LIBOR deviated dramatically from its historic relationships with other economic indicators. This sudden and dramatic variation is consistent with the fact that Defendants were in fact manipulating LIBOR, as opposed to accurately reporting market characteristics.

**1.    LIBOR Diverges From Its Historical Relationship With The Eurodollar**

68.    The U.S. dollar LIBOR, in effect, measures the interest rate offered to panel banks to borrow U.S. dollar deposits, also known as Eurodollars. Eurodollars are also traded in the market, and the market rate for Eurodollars is commonly seen as the best market proxy for LIBOR. An analysis conducted by Connan Snider, a Professor at UCLA, and Thomas Youle, a Professor at the University of Minnesota, emphasized that, prior to August 2007, the previous day's Eurodollar bid rate was a better predictor of LIBOR than the previous day's LIBOR.

69.    Historically, the difference between LIBOR and Eurodollar rate, known as

15

LIBOR/Eurodollar spread (effectively LIBOR minus the Eurodollar bid rate), averaged 2.75 basis points.[1]  The spread was almost always positive, meaning the Eurodollar rate was slightly lower, reflecting the measurement of LIBOR as an offer rate and the Eurodollar rate as a bid rate on U.S. dollar deposits.  After August 2007, Defendants' manipulation and suppression of LIBOR resulted in a decoupling of LIBOR and the Eurodollar rate, and a reversal of the relationship so that the spread was negative.  In the post manipulation period, the average spread was -24.70 basis points.

70.     Even more indicative of Defendants' manipulation was that after August 2007, LIBOR/Eurodollar spread became strongly negative as opposed to the historical mildly positive relationship.  This change in the historical relationship is evidence of the downward manipulation of LIBOR.  In some cases, LIBOR was 15 to 20 basis points lower than the Eurodollar market rate.  In effect, LIBOR reported that banks were offering Eurodollars at a rate lower than market participants were actually buying them, a result that strongly indicates Defendants' manipulation of LIBOR.

71.     When Snider and Youle performed the identical analysis for the period after August 2007, they found that the previous day's Eurodollar rate had less predictive power on LIBOR.  In fact, as LIBOR dropped below the Eurodollar rate, the previous day's LIBOR became a better predictor of the current LIBOR.  This demonstrates that LIBOR was no longer responding to market forces, but instead was the product of Defendants' manipulation.

72.     Based on information and belief, the analysis of the Eurodollar market strongly supports that Defendants suppressed their LIBOR quotes and colluded to suppress reported

---

[1] A "basis point" is a term commonly used to measure a financial instrument's interest rates. A basis point is equal to 1/100th of 1%.  It is a commonly used term of measurement for financial instruments because daily rate changes are typically smaller than 1 percent, though small changes have huge financial effects.

LIBOR. Moreover, this analysis supports the fact that Defendants colluded to control the amount of suppression over the Class period.

73.     The U.S. Federal Reserve prepares and publishes Eurodollar deposit rates for banks based on numerous bank submissions to Bloomberg and ICAP – the world's leading inter-dealer broker and provider of post-trade risk and information services.  These rates are analogous to LIBOR in that they reflect the rates at which banks in London Eurodollar money market lend U.S. dollars to one another.  ICAP publishes these submissions at 9:30 each morning.

74.     Based on information and belief, while Defendants had access to Federal Reserve Eurodollar Deposit Rate prior to submission of LIBOR quotes, an individual panel bank would not have access to any other panel banks intended Federal Reserve Eurodollar Deposit Rate absent collusion.

75.     Based on information and belief, by virtue of the parallel nature between the Federal Reserve Eurodollar Deposit Rate and LIBOR, it would be unusual for even one bank to submit a LIBOR bid below the Eurodollar Deposit Rate.

76.     Based on information and belief, Defendants routinely submitted LIBOR quotes below the Federal Reserve Eurodollar Deposit Rate throughout the Class Period.  Because no Defendant Bank – absent collusion – could know what LIBOR quote another panel bank actually intended to submit prior to those numbers being made public at 11:10, the fact that Defendants submitted LIBOR quotes below the Eurodollar Deposit Rate strongly supports the participation of each Defendant Bank in a suppressive and collusive scheme.

77.     Recent non-prosecution agreements between Defendant Barclays and the Department of Justice confirm that Barclays' LIBOR submitters set that bank's U.S. dollar

LIBOR at the request of traders from "other banks" during the time period encompassing Snider and Youle's analysis.

### 2.  LIBOR Diverges From Its Historical Relationship With Credit Default Swaps

78.     Another economic indicator that Defendants suppressed U.S. dollar LIBOR during the Class Period was the deviation from the historical ratio between panel members' LIBOR quotes and their subsequent cost in buying default insurance – i.e., a credit-default swap on debt they issued during that period.  A credit default swap ("CDS") is a swap contract and agreement in which the protection buyer of the CDS makes a series of payments (often referred to as the CDS "fee" or "spread") to the protection seller and, in exchange, receives a payment if the underlying credit instrument (typically a bond or loan) experiences a credit event.  The spread between the LIBOR quotes and cost in buying default insurance serves as a measure of the perceived risk of default by the entity issuing the underlying bond or receiving the loan. The greater the risk of default on the underlying bond or loan, the greater the spread.  In the case of a CDS whose underlying instrument is an interbank loan in which a panel bank is the borrower, the greater the perceived risk that the panel bank will default on the loan, the higher its CDS spread.

79.     CDSs are a useful benchmark for LIBOR because both CDSs and LIBOR are a measure of perceived credit risks.  As one commentator has observed, "[t]he cost of bank default insurance has generally been positively correlated with LIBOR.  That is, in times when banks were thought to be healthy, both the cost of bank insurance and LIBOR decreased or remained low, but when banks were thought to be in poor condition, both increased."  During the Class Period, however, those historically-correlated indicia of banks' borrowing costs diverged significantly.

18

80.     On May 29, 2008, Carrick Mollenkamp and Mark Whitehouse ("Mollenkamp and Whitehouse") published an article in the Journal, emphasizing significant disparities between certain panel banks' perceived risk in the CDS market and their LIBOR reporting.  A higher CDS spread is indicative of a larger perceived risk in lending to an institution because it represents the cost of insuring against a default on that loan.  The Journal found that beginning in January 2008, "the two measures began to diverge, with reported LIBOR rates failing to reflect rising default-insurance costs."

81.     The *Journal* observed that the widest gaps existed with respect to the LIBOR quotes of Defendants Citibank, WestLB, HBOS, JPMorgan Chase, and UBS.  According to the *Journal*'s analysis, Citibank's LIBOR quotes differed the most from what the CDS market suggested the bank's borrowing cost was.  On average, the rates at which Citibank reported it could borrow dollars for three months (*i.e.*, its three-month LIBOR quote) were about 87 basis points lower than the rates calculated using CDS data.  WestLB, HBOS, JPMorgan Chase, and UBS likewise exhibited significant LIBOR-CDS discrepancies – of 70, 57, 43, and 42 basis points, respectively – while Defendants Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds and RBS each exhibited discrepancies of about 30 basis points.  The study's authors concluded "one possible explanation for this gap is that banks understated their borrowing rates."

82.     Citing another example of suspicious conduct, the *Journal* observed that on the afternoon of March 10, 2008, investors in the CDS market were betting that WestLB – hit especially hard by the credit crisis – was nearly twice as likely to renege on its debts as Credit Suisse, which was perceived to more stable economically, yet the next morning the two banks submitted identical LIBOR quotes.

83.     Additionally, having compared the banks' LIBOR quotes to their actual costs of

borrowing in the commercial-paper market, the *Journal* reported, for example that in mid-April 2008, UBS paid 2.85% to borrow for three months but on April 16, 2008 had quoted a borrowing cost of 2.73% to the BBA.

84.     The *Journal* furthered noted a divergence from the historical benchmark of CDS spread: banks' reported three month borrowing rates differed by only .06 percentage points while CDS insurances costs varied widely. *Journal* contributor Darrell Duffee described the bunched LIBOR quotes as "far too similar to be believed."

85.     Calculating an alternate borrowing rate incorporating CDS spreads, the *Journal* estimated that misreporting of LIBOR had a $45 billion effect on the market representing the amount borrowers (the banks) did not pay to lenders (investors in debt instruments issued by the banks) that they would otherwise have had to pay.

86.     Accordingly to the *Journal*, three independent academics, including Professor Duffee, reviewed its methodology and findings, at the *Journal's* request. All three deemed the *Journal's* approach "reasonable."

87.     In their analysis, which followed Mollenkamp and Whitehouse, Snider and Youle performed two separate comparisons between LIBOR and CDSs to highlight inconsistencies in LIBOR reporting. First, they noted that a specific reporting bank may have a comparatively higher CDS spread than a second reporting bank (and therefore be perceived as comparatively "riskier"), while simultaneously having a lower LIBOR than the same bank (which would indicate that it is perceived as a "less risky" investment). For example, Citigroup consistently has a substantially higher CDS spread than the Bank of Tokyo-Mitsubishi, yet Citigroup reported comparatively lower LIBOR quotes. Mollenkamp and Whitehouse also noted the same pattern.

88.     Based on information and belief, a comparison between each bank's probabilities of default ("PDs") and the LIBOR quotes the bank submitted to the BBA indicate that banks suppressed LIBOR.

89.     Based on information and belief, PD provides a measure of a bank's credit (or default risk exposure), essentially the likelihood that the bank will default within a specified time period.  A finding of a statistically significant negative correlation coefficient between daily LIBOR quotes and PDs for a given term period violates the fundamental relationship between risk and return.  Investors require a higher required rate of return as a premium for taking on additional exposure.  This results in a positive relationship between risk and return.

90.     Based on information provided, a significant negative coefficient between a bank's daily LIBOR quotes and its PDs indicates that PDs increased while LIBOR quotes decreased.

91.     Based on information and belief, LIBOR quotes for all LIBOR panel banks (except HSBC) during 2007 were negatively correlated with their respective PDs to a significant degree.

92.     Based on information and belief, LIBOR quotes for all of LIBOR panel banks, during 2008 were negatively correlated with respect to their respective PDs at the one-month and three-month maturities demonstrating Defendants' collusive scheme.

C.     **Inconsistencies With LIBOR Reporting By Individual Banks**

93.     A close examination of the borrowing rates reported by Defendants to Reuters for calculation of LIBOR during the Class Period and each bank's incentive to manipulate LIBOR further evidences Defendants' conspiracy to manipulate and suppress LIBOR.  For example, Alexandre Harthieser of ESCP Europe and Natixis Bank and Phillippe K. Spieser, Professor of

Finance at ESCP Europe, performed clustering analysis on the panel members' individual reporting and concluded "a suspect cartel has been identified."

1.   **Panel Banks Report Inconsistent Rates Across Currencies**

94.   Panel banks report LIBOR across different currencies each day. Since LIBOR is a measure of a bank's stability as an institution, absent manipulation, the comparative ranking of panel banks should largely be the same across different currencies (allowing for the variation in panel composition across currencies). A comparison of LIBOR across different currencies shows this is not consistently so.

95.   For example, Bank of America and Bank of Tokyo-Mitsubishi both report rates to Reuters for calculation of the U.S. dollar and Yen LIBOR. Over the manipulation period, it was common for Bank of America to simultaneously quote a lower rate than Bank of Tokyo-Mitsubishi in U.S. dollar LIBOR and a higher quote in the Yen LIBOR. Since institutional risk should be the same for each panel bank regardless of the what currency it is measured in, this indicates that the rates being reported do not accurately reflect market conditions and are an indication of manipulation.

96.   Based upon information and belief, Defendants Barclays, Citigroup, and JPMorgan Chase displayed similar anomalies across currencies. For example, Citigroup often reported rates at the top of the Yen-LIBOR scale while simultaneously quoting rates at the bottom of the U.S. dollar LIBOR scale. Since the credit risk for the bank is the same regardless of currency, the reversal in currency ranking is not indicative of differences in credit risk.

97.   Pursuant to recent non-prosecution agreements, Barclays admits that other Defendants submitted what Barclays believes to be fraudulent LIBOR rates during the

manipulation period.  In addition, Barclays admits to submitting improper rates at the request of traders at other banks.

### 2.   **Bunching**

98.    Throughout the Class Period, the rates reported by certain Defendants "bunch" around the fourth lowest quote each day.  That is to say that the rates reported by those Defendants to Reuters were consistently near the fourth lowest of the 16 panel banks.  Since Reuters, at the time, calculated LIBOR by removing the lowest (and highest) four reported rates everyday, bunching around the fourth lowest rate is suggestive that those Defendants collectively acted and colluded to suppress and manipulate LIBOR.

99.    As an initial matter, bunching among Defendants' reported rates demonstrates that Defendants intended to report the same or similar rates.  The individual variation between the financial situations of each reporting bank should lead to differences in the reported rates.  The fact that, throughout the Class Period, Defendants repeatedly reported identical rates to Reuters is an indication that Defendants were conspiring to manipulate LIBOR.

100.    Further, certain Defendants' consistent bunching of their reported rates at or near the fourth lowest position is suggestive of their intent to artificially suppress LIBOR. This is because the fifth lowest quote is the lowest quote that is included by Reuters in calculating the day's LIBOR. Defendants' clustering at or near the fourth lowest rate ensures that the artificially low rates reported by Defendants will be included in the BBA's daily calculation resulting in the artificial suppression of LIBOR.

101.    The following charts of daily U.S. dollar LIBOR reported rates show the frequency with which Defendants Bank of America, Citibank, HSBC, and JP Morgan reported

within a given percentage rate from the 4th lowest quote. A negative difference means that they were below the 4th lowest quote, and therefore not included in the daily LIBOR calculation. Zero difference means that they either were the 4th lowest quote on a given day or tied at the same value as the 4th lowest quote.[2]





---

[2] If there is a tie between LIBOR quotes on a given day, one of the banks' quotes is discarded at random.

24





102.    While bunching is reflective of Defendants' intention to report the lowest borrowing rate to be calculated by Reuters, *i.e.*, the fifth lowest borrowing rate, this does not suggest that the panel banks reporting the four lowest quotes (quotes that are discarded by Reuters) are not members of the conspiracy.  Due to the mechanics of LIBOR calculation, there will always be discounted outliers.  If all of the panel banks reported the same low rate, the

lowest four would always be discounted.  Therefore by bunching quoted rates around the fourth lowest rate, the panel banks ensured the maximum downward manipulation.

>**3.** **The Divergence between LIBOR and its Historical Relationship with the Federal Reserve Auction Rate Indicates Suppression of LIBOR.**

103.    A comparison between LIBOR and the Federal Reserve auction rate further suggests Defendants artificially suppressed LIBOR during the Class Period.  An April 16, 2008 *Journal* article, for example, noted the Federal Reserve had recently auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82%—10 basis points higher than the comparable USD-LIBOR.  That differential would make no economic sense if the reported LIBOR was accurate, the *Journal* observed,"[b]ecause banks put up securities as collateral for the Fed loans, they should get them for a lower rate than Libor, which is riskier because it involves no collateral."

104.    A subsequent *Journal* article raised further concerns about LIBOR's accuracy based on the comparison of one-month LIBOR with the rate for the 28-day Federal Reserve auction.  According to the *Journal*, because the Federal Reserve requires collateral

>[B]anks should be able to pay a lower interest rate [to the Fed] than they do when they borrow from each other [*e.g.*, as ostensibly measured by LIBOR] because those loans are unsecured.  It is the same reason why rates for a mortgage, which is secured by a house, are lower than those for credit cards, where the borrower doesn't put up any collateral.  In other words, the rate for the Fed auction should be lower than Libor.

To the contrary, though, two days before the *Journal* article (September 22, 2008), the rate for the 28-day Fed facility was 3.75%—much higher than one-month USD-LIBOR, which was 3.18% that day and 3.21% the next day.

4.      **The Divergence between LIBOR and its Historical Correlations
to overnight index swaps also suggests it was artificially
suppressed during the Class Period.**

105.    Yet another measure of LIBOR's aberrant behavior with respect to other

measures of banks' borrowing costs during the Class Period is its observed deviation from the

overnight-index swap ("OIS") rate.  In his academic article analyzing LIBOR data for the period

of the second half of 2007 and 2008, Justin Wong observed that between 2001 and July 2007,

when the global credit crisis began, the spread between LIBOR and the OIS rate "averaged

eleven basis points."  By July 2008, on the other hand, that gap approached 100 basis points, a

figure significantly higher than the spread from a year prior, and by October 2008, "it peaked at

366 basis points."  While the spread "receded somewhat in November 2008 to 209 basis points,"

that was still "far above the pre-crisis level."  Wong's analysis provides further support for

Plaintiffs' allegations that Defendants suppressed LIBOR.

5.      **Defendants Had Significant Incentives to Manipulate LIBOR**

106.    Defendants held significant financial positions in LIBOR-Based derivatives, such

as in exchange-traded futures contracts and in over-the-counter Interest Rate Swaps, providing

them incentive to suppress LIBOR.  Defendants' positions in Interest Rate Swaps, for example,

were so large throughout the Class Period, that even a small, unhedged exposure to LIBOR-

Based derivatives would create enormous financial incentives for Defendants to manipulate

LIBOR.  Furthermore, when LIBOR experienced a significant drop in the first quarter of 2009,

Defendants reaped billions of dollars in profits. It was no accident that Defendants experienced

sharply increased profits in their Interest Rate Swap positions at the time LIBOR fell—

Defendants purposely took positions in Interest Rate Swaps, which benefited from their

suppression of LIBOR.  Upon information and belief, throughout the Class Period, Defendants'

manipulation and suppression of LIBOR benefited their other LIBOR-Based derivative positions as well.

107.    As a result of these incentives Defendants' trading positions came to dominate their reporting obligations to the BBA. A *Financial Times* article reported, for example, that Barclays is currently under investigation by the regulatory authorities of the United States and the United Kingdom for violating "Chinese Wall" rules which restrict information sharing between different parts of the bank. Barclays' treasury department submits its daily borrowing costs to the BBA and that department should be "walled-off" from Barclays traders. Barclays is being investigated regarding communications between its traders and its treasury department, which improperly influenced the daily submission process.

## III.    Governmental Investigations

### 1.    Defendants' regulatory filings and news reports indicate U.S. government and foreign regulatory bodies are investigating Defendants for LIBOR manipulation.

108.    Defendants' conspiracy to manipulate and make artificial LIBOR-Based derivatives during the Class Period has spurred investigations by numerous government regulatory agencies into the reporting practices of various banks on the U.S. dollar panel.

109.    The regulatory investigations were first publicly disclosed on March 15, 2011, when UBS disclosed in its annual report that it had received subpoenas from the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), and the United States Department of Justice ("DOJ"), as well as an information request from the Japanese Financial Supervisory Agency, relating to its reporting of lending rates to Reuters for calculation of LIBOR. On February 28, 2012, it was reported that the Department of Justice investigation was criminal in nature. UBS's disclosure states that the focus of the investigations

is "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times." Other Defendants have subsequently disclosed that they are subject to investigation by regulatory authorities related to LIBOR.

110.   A *Financial Times* article published the same day as UBS's disclosure reported that the three U.S. agencies, the Japanese Financial Supervisory Agency and the United Kingdom's Financial Services Authority ("FSA") had also requested information, and had begun interviewing witnesses, connected to Defendants UBS, BAC, Citigroup, and Barclays for several months.  The next day, *Bloomberg* reported that Barclays, Citigroup, and Bank of America had received subpoenas from U.S. regulators. Additionally, regulators contacted Defendants WestLB, and Lloyds as part of the LIBOR investigations.

111.   On March 23, 2011, Bloomberg revealed that U.S. regulators notified Citigroup, Inc., Deutsche Bank, BAC, and JPMorgan Chase that employees may be subpoenaed in connection with the underlying investigations.

112.   In late Spring, 2011 Barclays, RBS, and Lloyds disclosed that each of them was cooperating with regulators regarding government investigations into LIBOR submission rates by relevant panel banks.

113.   On July 26, 2011, the *Financial Times* reported that investigators had expanded their probe to include yen-based LIBOR and the Tokyo interbank offered rate ("TIBOR").  In its results announcement made that day, UBS confirmed that the investigation's scope had widened and disclosed that it had received "conditional leniency and conditional immunity" from the United States Department of Justice for turning over information on the setting of yen-based LIBOR and of the TIBOR.  UBS said that while its immunity stretched to the yen-based LIBOR and the TIBOR, the deal did not bar the Department of Justice or other "government agencies

from asserting other claims against us." The Antitrust Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity" and the policies protect leniency recipients from criminal conviction. Notably, each of the Defendants from 2006 to 2009 was also a member of the yen-based LIBOR panel. UBS has also received conditional amnesty from the Swiss Competition Commission and the Canadian Competition Bureau.

114.    On August 1, 2011, for example, HSBC released its 2011 Interim Results and Barclays released its Half-Yearly Report in the United Kingdom, each disclosing that they were under investigation by various regulatory authorities around the world. Barclays specifically identified investigations by the FSA, the CFTC, the SEC, the DOJ's Fraud Section of the Criminal Division and Antitrust Division, and the European Commission. The *Journal* has reported that the investigators are looking into whether the banks effectively formed a global cartel and coordinated how to report borrowing costs between 2006 and 2008.

115.    On October 19, 2011, the *Journal* reported that the European Commission "seized documents from several major banks" the previous day, "marking the escalation of a worldwide law-enforcement probe" regarding the Euro Interbank Offered Rate, or Euribor—a benchmark, set by more than 40 banks, used to determine interest rates on trillions of euros' worth of euro-denominated loans and debt instruments. The Euribor inquiry, the *Journal* explained, constitutes "an offshoot" of the broader LIBOR investigation that had been ongoing for more than a year. According to the *Journal*, while the list of financial firms raided by the European Commission was not available, people familiar with the situation had counted "a large French bank and a large German bank" among the targets and the coordinated raids "occurred in London and other European cities."

30

116.     On October 31, 2011, the *Financial News* observed that "[a]n investigation into price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS, Citigroup, and Bank of America, had been quoting deliberately low rates."

117.     On December 9, 2011, *Law360* reported that the Japanese Securities and Exchange Surveillance Commission ("SESC") alleged that Citigroup Global Markets Japan Inc. and UBS Securities Japan Ltd. "employed staffers who attempted to influence" TIBOR "to gain advantage on derivative trades." The SESC recommended that the Japanese prime minister and the head of Japan's Financial Services Agency ("JFSA") take action against the companies. The Commission specified that Citigroup's head of G-10 rates and a Citigroup trader, as well as a UBS trader, were involved in the misconduct, further stating, "[t]he actions of Director A and Trader B are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets." Moreover, the Commission added, "[i]n spite of recognizing these actions, the president and CEO . . . who was also responsible for the G-10 rates, overlooked these actions and the company did not take appropriate measures, therefore, the company's internal control system is acknowledged to have a serious problem." *Law360* reported that the SESC released "a similar statement" about UBS's alleged conduct.

118.     Citigroup and UBS did not deny the SESC's findings. A Citigroup spokesperson stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes to clients and all parties concerned for the issues that led to the recommendation. The company has started working diligently to address the issues raised." A UBS spokesperson similarly stated the bank was taking the findings "very seriously" and had been "working closely with" the SESC and the JFSA "to ensure all issues are fully addressed and resolved." She added, "We have taken appropriate personnel action against the employee involved in the conduct at issue."

31

119.    Citigroup later disclosed that on December 16, 2011, the JFSA took administrative action against Citigroup Global Markets Japan, Inc. ("CGMJ") for, among other things, certain communications made by two CGMJ traders about the Euroyen Tokyo InterBank Offered Rate ("TIBOR").  The JFSA issued a business improvement order and suspended CGMJ's trading in derivatives related to Yen-LIBOR, as well as Euroyen and Yen-TIBOR from January 10 to January 23, 2012.  On the same day, the JFSA also took administrative action against Citibank Japan Ltd. for conduct arising out of Citibank Japan's retail business and also noted that the communications made by the CGMJ traders to employees of Citibank Japan about Euroyen TIBOR had not been properly reported to Citibank Japan's management team.

120.    UBS likewise recently revealed further details regarding the Japanese regulators' findings and the resulting disciplinary action.  Specifically, the bank announced that on December 16, 2011, the JFSA commenced an administrative action against UBS Securities Japan Ltd. ("UBS Securities Japan") based on findings by the SESC that:

(i)     a trader of UBS Securities Japan engaged in inappropriate conduct relating to Euroyen TIBOR and Yen LIBOR, including approaching UBS AG, Tokyo Branch, and other banks to ask them to submit TIBOR rates taking into account requests from the trader for the purpose of benefiting trading positions; and

(ii)    serious problems in the internal controls of UBS Securities Japan resulted in its failure to detect this conduct.

Based on those findings, the JFSA "issued a Business Suspension Order requiring UBS Securities Japan to suspend trading in derivatives transactions related to Yen LIBOR and Euroyen TIBOR" from January 10 to January 16, 2012 (excluding transactions required to perform existing contracts).  The JFSA also issued a "Business Improvement Order" requiring UBS Securities Japan to enhance "compliance with its legal and regulatory obligations" and to establish a "control framework" designed to prevent similar improper conduct.

32

121.   The *Journal* has since cited people familiar with the UBS matter as identifying the trader as Thomas Hayes, who joined UBS Securities Japan in 2006 "and traded products linked to the pricing of short-term yen-denominated borrowings"; he worked at UBS for about three years.

122.   In the same article, the *Journal* more broadly reported that investigators in the U.S. and foreign LIBOR probes "are focusing on a small number of traders suspected of trying to influence other bank employees to manipulate the rates."

123.   Other news accounts in recent months have confirmed—based at least in part on information from people familiar with the ongoing investigations—that investigators are examining potential improper collusion by traders and bankers to manipulate LIBOR or other rates.  On February 3, 2012, for instance, Credit Suisse disclosed that the Swiss Competition Commission commenced an investigation involving twelve banks and certain other financial intermediaries, including Credit Suisse, concerning alleged collusive behavior among traders to affect the bid ask spread for derivatives tied to the LIBOR and TIBOR reference rates fixed with respect to certain currencies, and collusive agreements to influence these rates.

124.   Additionally, on February 14, 2012, *Bloomberg* reported that two people with knowledge of the ongoing LIBOR probe said global regulators "have exposed flaws in banks' internal controls that may have allowed traders to manipulate interest rates around the world." The same people, who were not identified by name (as they were not authorized to speak publicly about those matters), stated investigators also had "received e-mail evidence of potential collusion" between firms setting LIBOR.  Those sources further noted Britain's FSA was "probing whether banks' proprietary-trading desks exploited information they had about the

direction of Libor to trade interest-rate derivatives, potentially defrauding their firms' counterparties."

125.   *Bloomberg* further reported that RBS had "dismissed at least four employees in connection with the probes," and Citigroup and Deutsche Bank "also have dismissed, put on leave or suspended traders as part of the investigations."

126.   *Bloomberg* also reported that European Union antitrust regulators are also investigating whether banks effectively formed a global cartel and coordinated how to report borrowing costs between 2006 and 2008.

127.   In March 2012, the Monetary Authority of Singapore disclosed that it has been approached by regulators in other countries to help in investigations over the possible manipulation of interbank interest rates.

128.   *Bloomberg* interviewed money-market traders in March 2012, who said that staff responsible for panel banks' LIBOR submissions "regularly discussed where to set the measure with traders sitting near them, interdealer brokers, and counterparts at rival banks." "The talks became common practice after money markets froze in 2007. . . . Traders interviewed said there were no rules stopping talks between employees, or guidelines on how the rate should be set." The "BBA says only a bank's Treasurer or other nominated individual can make a submission, but a trader at one firm [told Bloomberg] that a large number of employees had access to the software used to make the bank's submissions and could overwrite other's figures." *The Telegraph* reported that "senior bankers privately admit it is easy for banks to fix Libor at rates that are favorable to their own interests, as the task of setting the rate is often undertaken by relatively junior employees."

129.    According to the *Daily Mail*, investigations by the SEC, FSA, the Swiss Competition Commission, and regulators in Japan focus on three concerns: First, whether banks artificially suppressed LIBOR during the financial crisis, making banks appear more secure than they actually were; second, whether bankers setting LIBOR leaked their data to traders before officially submitting the banks' LIBOR quotes to the BBA; third, whether traders at the banks, and at other organizations (such as hedge funds), may have tried to influence LIBOR by making suggestions or demands on the bankers providing LIBOR quotes.

130.    On July 7, 2012, *Businessweek* reported that two Deutsche Bank traders were suspended by the bank after external auditors determined that these employees were involved in manipulating LIBOR.

### 2.    Defendant Barclays' settlement agreement U.S. government and foreign regulatory bodies demonstrate a conspiracy to manipulate LIBOR.

131.    On June 27, 2012, Defendant Barclays agreed to pay more than $450 million in settlement and administrative penalties in order to reconcile proceedings initiated by the Department of Justice, the Commodity Futures Trading Commission, and the United Kingdom Financial Security Authority.

132.    Barclays' non-prosecutorial agreement with the Department of Justice, the District Attorney for the County of New York, New York, and the Department of the Treasury requires Barclays to pay $298 million. Pursuant to the agreement, the bank admitted to setting sham U.S. dollar LIBOR and EURIBOR rates based upon requests by traders at other banks.

133.    Specifically, among other admissions, Barclays "agree[d] that the following information is true and accurate:"

i.   Certain Barclays' traders conspired with traders from other banks to manipulate the U.S. dollar LIBOR or EURIBOR.  During the manipulation period, Barclays' traders propositioned traders at other Defendant banks for favorable LIBOR or EURIBOR submissions from those banks.  In addition, certain Barclays traders solicited similar requests from traders at other banks for favorable LIBOR or EURIBOR submissions from Barclays' rate submitters.  In turn, those Barclays' traders relayed the requested LIBOR or EURIBOR submission to the Barclays' LIBOR or EURIBOR submitters to the benefit of their counterparts. ii.       "The likelihood that the LIBOR or EURIBOR fix would be affected increased when other Contributor Panel banks also manipulated their submissions as part of a coordinated effort."

134.    On the same day, Barclays conceded to a penalty of £59.5 million from the Financial Services Authority for its involvement in the manipulation of the LIBOR and EURIBOR.  The Financial Services Authority found that Barclays on numerous occasions during the Class Period sought to influence the EURIBOR and U.S. dollar LIBOR submissions of other banks contributing to the rate settling process.  The settlement agreement between Barclays and the Financial Services Authority "sets out facts and matters relevant to" Barclays scheme to fraudulently manipulate the U.S. dollar LIBOR:

i.   Specifically, Barclays' submitters received 173 requests between January 2005 and May 2009 to manipulate the EURIBOR and LIBOR including 11 requests based on correspondence with traders at other banks.

ii.  Barclays traders petitioned Barclays' submitters to distort their U.S. dollar LIBOR submissions at the request of traders at traders at banks.

36

iii. During the Class Period, Barclays' traders made numerous requests to external traders with the aim that those traders would petition their banks' submitters to manipulate the banks' U.S. dollar LIBOR submissions.

iv. Barclays' traders conspired with external traders to manipulate the U.S. Dollar Libor and EURIBOR through the following methods:

> 1. "making internal requests to Barclays' Submitters;
>
> 2. making external requests to traders at other contributing banks in advance of and on particular days on which the [Barclays'] Traders stood to benefit; and
>
> 3. on occasion by encouraging cash traders to make bids or enter into transactions in the money markets at rates which might influence indirectly the EURIBOR submissions of any contributing bank observing market rates as a factor in determining its submissions."

135.    On July 3, 2012, Bob Diamond and Jerry del Missier each resigned their respective positions as Chief Executive Officer and Chief Operating Officer at Barclays.

136.    Based on the information provided from Barclays settlement agreements, Barclays submitted misleading U.S. dollar LIBOR rates by incorporating petitions made by Barclays' traders and traders at other banks.  These traders were motivated by profit at the expense of submitting accurate LIBOR rates.

137.    Based on the information provided from Barclays' settlement agreements, Barclays' traders conspired with traders from other Defendant banks to manipulate the LIBOR submissions of those banks.

138.     Defendant RBS has dismissed at least four employees in connection with the investigations, while Citigroup and Deutsche Bank have also dismissed, put on leave or suspended several employees as part of their internal investigations into these matters.

139.     Latham & Watkins LLP has observed that the coordinated antitrust investigations in the United States, EU, UK, [also Canada and Switzerland] and Japan indicate that the enforcers are cooperating with each other and that the antitrust investigations may have been triggered by one of the banks [UBS] taking advantage of the Antitrust Division's Corporate Leniency Policy, as well as other leniency policies around the globe.

> 3.     **Evidence disclosed in Canadian and Singapore proceedings confirm Defendants conspired to manipulate Yen-LIBOR as part of global conspiracy to manipulate BBA indexes.**

**Canadian Action**

140.     In the Canadian action, Brian Elliott, a Competition Law Officer in the Criminal Matters Branch of the Competition Bureau, submitted an affidavit in May 2011 (the "May 2011 Elliott Affidavit") in support of "an Ex Parte Application for Orders to Produce Records Pursuant to Section 11 of the Competition Act and for Sealing Orders" in the Court of Ontario, Superior Court of Justice, East Region. Specifically, the May 2011 Elliott Affidavit sought orders requiring HSBC Bank Canada, Royal Bank of Scotland N.V., Canada Branch, Deutsche Bank, J.P. Morgan Bank Canada, and Citibank Canada (referenced collectively in the Affidavit as the "Participant Banks") to produce documents in connection with an inquiry concerning whether those banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to March 11, 2010; to prevent or lessen, unduly, competition in the purchase, sale or supply of interest derivatives from 2007 to March 11, 2010; to restrain or injure competition

unduly from 2007 to March 11, 2010; and to fix, maintain, increase or control the price for the supply of interest rate derivatives from March 12, 2010 to June 25, 2010."

141.    The May 2011 Elliott Affidavit further states the Competition Bureau "became aware of this matter" after one of the banks (referenced in the affidavit as the "Cooperating Party") "approached the Bureau pursuant to the Immunity Program" and, in connection with that bank's application for immunity, its counsel "orally proffered information on the Alleged Offences" to officers of the Competition Bureau on numerous occasions in April and May 2011. Furthermore, according to the Affidavit, counsel for the Cooperating Party "stated that they have conducted an internal investigation of the Cooperating Party that included interviews of employees of the Cooperating Party who had knowledge of or participated in the conduct in question, as well as a review of relevant internal documents." The Affidavit also notes that on May 17, 2011, counsel for the Cooperating Party provided the Competition Bureau with "electronic records," which Elliot "believe[s] to be records of some of the communications involving the Cooperating Party that were read out as part of the orally proffered information by counsel for the Cooperating Party." The press has reported that UBS was the "Cooperating Party" referred to in the Elliott Affidavits.

142.    The Affidavit recounted that, according to the Cooperating Party's counsel, during the Class Period the Participant Banks—at times "facilitated" by "Cash Brokers"— "entered into agreements to submit artificially high or artificially low London Inter-Bank Offered Rate ('LIBOR') submissions in order to impact the Yen LIBOR interest rates published by the [BBA]." Those entities engaged in that misconduct to "adjust[] the prices of financial instruments that use Yen LIBOR rates as a basis." The Affidavit further states the Cooperating

Party's counsel "indicated the Participant Banks submitted rates consistent with the agreements and were able to move Yen LIBOR rates to the overall net benefit of the Participants."

143.    More specifically, counsel proffered that, during the Class Period, the Participant Banks "communicated with each other and through the Cash Brokers to form agreements to fix the setting of Yen LIBOR," which "was done for the purpose of benefiting trading positions, held by the Participant Banks, on IRDs [interest rate derivatives]." By manipulating Yen LIBOR, the Affidavit continues, "the Participant Banks affected all IRDs that use Yen LIBOR as a basis for their price." The misconduct was carried out "through e-mails and Bloomberg instant messages between IRD traders at the Participant Banks and employees of Cash Brokers (who had influence in the setting of Yen LIBOR rates)." The Affidavit details:

> IRD traders at the Participant Banks communicated with each other their desire to see a higher or lower Yen LIBOR to aid their trading position(s). These requests for changes in Yen LIBOR were often initiated by one trader and subsequently acknowledged by the trader to whom the communication was sent. The information provided by counsel for the Cooperating Party showed that the traders at Participant Banks would indicate their intention to, or that they had already done so, communicate internally to their colleagues who were involved in submitting rates for Yen LIBOR. The traders would then communicate to each other confirming that the agreed up rates were submitted. However, not all attempts to affect LIBOR submissions were successful.
>
> The Cash Brokers were asked by IRD traders at the Participant Banks to use their influence with Yen LIBOR submitters to affect what rates were submitted by other Yen LIBOR panel banks, including the Participant Banks.

144.    The Affidavit indicates the Cooperating Party's counsel further proffered that at least one of the Cooperating Party's IRD traders ("Trader A" or "Trader B") communicated with IRD traders at HSBC, Deutsche Bank, RBS, JPMorgan (two traders), and Citibank. In that regard, the Affidavit specifies:

> Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and instructions for the HSBC trader to get HSBC to make Yen LIBOR submissions consistent with his wishes. Attempts through the HSBC trader to influence Yen LIBOR were not always successful. Trader A also

communicated his desire for a certain movement in the Yen LIBOR rate with the Cash Brokers. He instructed them to influence the Yen LIBOR submitters of HSBC. The Cash Brokers acknowledged making these attempts.

Trader A communicated his trading positions, his desire for certain movement in Yen LIBOR and asked for the Deutsche IRD trader's assistance to get Deutsche to make Yen LIBOR submissions consistent with his wishes. The Deutsche IRD trader also shared his trading positions with Trader A. The Deutsche IRD trader acknowledged these requests. Trader A also aligned his trading positions with the Deutsche IRD trader to align their interests in respect of Yen LIBOR. The Deutsche IRD trader communicated with Trader A considerably during the period of time, mentioned previously, when Trader A told a Cash Broker of a plan involving the Cooperating Party, HSBC and Deutsche to change Yen LIBOR in a staggered and coordinated fashion by the Cooperating Party, HSBC and Deutsche. Not all attempts to change the LIBOR rate were successful.

Trader A explained to RBS IRD trader who his collusive contacts were and how he had and was going to manipulate Yen LIBOR. Trader A also communicated his trading positions, his desire for certain movement in Yen LIBOR and gave instructions for the RBS IRD trader to get RBS to make Yen LIBOR submissions consistent with Trader A's wishes. The RBS IRD trader acknowledged these communications and confirmed that he would follow through. Trader A and the RBS IRD trader also entered into transactions that aligned their trading interest in regards to Yen LIBOR. Trader A also communicated to another RBS IRD trader his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get RBS to make Yen LIBOR submissions consistent with his wishes. The second RBS IRD trader agreed to do this.

Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and gave instructions for them [two JPM IRD traders] to get JPMorgan to make Yen LIBOR submissions consistent with his wishes. Trader A also asked if the IRD traders at JPMorgan required certain Yen LIBOR submissions to aid their trading positions. The JPMorgan IRD traders acknowledged these requests and said that they would act on them. On another occasion, one of the JPMorgan IRD traders asked Trader A for a certain Yen LIBOR submission, which Trader A agreed to help with. Trader A admitted to an IRD trader at RBS that he colluded with IRD traders at JPMorgan.

Trader B of the Cooperating Party communicated with an IRD trader at Citi. They discussed their trading positions, advanced knowledge of Yen LIBOR submissions by their banks and others, and aligned their trading positions. They also acknowledged efforts to get their banks to submit the rates they wanted.

145.    On May 18, 2011, the Ontario Superior Court signed the orders directing the

production of the records sought by the May 2011 Elliott Affidavit.

146.    Elliott submitted another affidavit in June 2011 (the "June 2011 Elliott Affidavit"), which sought an order requiring ICAP Capital Markets (Canada) Inc., believed to be one of the "Cash Brokers" referenced in the May 2011 Elliott Affidavit, to "produce records in the possession of its affiliates, ICAP PLC and ICAP New Zealand Ltd." The June 2011 Elliott Affidavit primarily detailed communications between "Trader A" (an IRD trader) of the previously-referenced "Cooperating Party" and an ICAP broker (referenced in the June 2011 Elliott Affidavit as "Broker X") during the Class Period.

147.    The Affidavit specifies that Trader A "discussed his current trading positions with Broker X and where he would like to see various maturities of Yen LIBOR move." Trader A "asked Broker X for Yen LIBOR submissions that were advantageous to Trader A's trading positions," and Broker X, in turn, "acknowledged these requests and advised Trader A about his efforts to make them happen." The Affidavit further states:

> Counsel for the Cooperating Party has proffered that the expectation was for Broker X, directly or through other brokers at ICAP, to influence the Yen LIBOR submissions of Panel Banks. Broker X communicated to Trader A his efforts to get brokers at ICAP in London to influence Yen LIBOR Panel Banks in line with Trader A's requests. The efforts of Broker X included contacting a broker at ICAP in London who issued daily LIBOR expectations to the market. Trader A also communicated to Broker X his dealings with traders at other Participant Banks and a broker at another Cash Broker. Not all efforts to influence Yen LIBOR panel banks were successful. Broker X had additional discussions around the setting of Yen LIBOR with another trader of the Cooperating Party ("Trader B").

148.    On June 14, 2011, the Ontario Superior Court issued an order allowing the document requests concerning ICAP.

**Singapore Proceedings**

149.    More information about the collusive behavior of Yen LIBOR panel banks was revealed in a Singapore wrongful termination lawsuit. In a pending legal action in Singapore's

High Court, Tan Chi Min, former head of delta trading for RBS's global banking and markets division in Singapore (who worked for RBS from August 12, 2006 to November 9, 2011), alleges in his Writ of Summons and Statement of Claim that the bank condoned collusion between its traders and LIBOR rate-setters to set LIBOR at levels to maximize profits.  In the same filing, Tan stated RBS commenced an internal probe following inquiries by European and U.S. authorities about potential LIBOR manipulation.

150.    Tan—whom RBS terminated, asserting he engaged in "gross misconduct"— alleges that RBS's internal investigations "were intended to create the impression that such conduct was the conduct not of the defendant itself but the conduct of specific employees who the defendant has sought to make scapegoats through summary dismissals."  Tan asserts RBS's rate setters took "into account the views of various employees before submitting a rate to the appropriate rate setting body."  Tan further alleges that it was "part of his responsibilities to provide input and submit requests to the rate setter and there is no regulation, policy, guideline or law that he has infringed in doing this," and that "it was common practice among [RBS]'s senior employees to make requests to [RBS]'s rate setters as to the appropriate LIBOR rate."  Those requests, Tan specified, "were made by, among others, Neil Danziger, Jezri Mohideen (a senior manager), Robert Brennan (a senior manager), Kevin Liddy (a senior manager) and Jeremy Martin," and the practice "was known to other members of [RBS]'s senior management including Scott Nygaard, Todd Morakis and Lee Knight."  Tan added that RBS employees "also took requests from clients (such as Brevan Howard) in relation to the fixing of LIBOR."

151.    In his complaint, however, Tan alleged that he could not have influenced the rate on his own.  He also stated it was "common practice" among RBS's senior employees to make requests as to the appropriate LIBOR quote.

152.    Indeed, in responding to Tan's allegations, RBS admitted he had tried to improperly influence RBS rate-setters from 2007 to 2011 to submit LIBOR quotes at levels that would benefit him.

153.    In subsequent filings with the Singapore High Court, Tan claims that RBS "interest-rate traders were seated with one of the main rate setters in its London office to share information, and discussed rates on conference calls," (according to *Businessweek*).  Tan also claims that RBS's head of compliance sent an email to Tan's manager indicating that it was acceptable for a trader to request specific swap-offer rates from rate setters.  According to *Businessweek*, Tan also asserts in his filing that he was told by his manager that "the practice of requesting to change the rate Libor is common in every rate setting environment in the banking industry."

### 4.    Defendants' regulatory filings and news reports indicate U.S. government and foreign regulatory bodies are investigating Defendants for LIBOR manipulation.

154.    Other individuals employed by the Defendants and their affiliates who have engaged in the illegal communications and conduct among Defendants to report artificially low LIBOR quotes include, but are not limited to, the following individuals who have been identified by the press or government agencies as the targets of the world-wide government investigations.

(a) Yvan Ducrot was the Co-head of UBS's rates business. According to an article in *Citywire*, he was suspended by UBS in connection with international probes.

(b) Holger Seger was the global head of short-term interest rates trading at UBS. According to an article in *Citywire*, Mr. Seger was suspended by UBS in connection with international probes and left his position at UBS in April 2012.

(c) Paul White was the principal rate-setter for Yen-LIBOR for RBS. According to an article in *Businessweek*, Mr. White was fired by UBS in November 2011 in connection with the circumstances brought to light by the Singapore lawsuit.

(d) Tan Chi Min was the head of short-term interest rate trading for Yen and the head of Delta One trading at RBS. In his Singapore lawsuit, Mr. Tan alleges that RBS fired him "because he tried to improperly influence the bank's rate setters from 2007 to 2011 to persuade them to offer Libor submissions that would benefit his trading positions."

(e) Sim Suh Ting was the executive director and head of regulatory risk & compliance for South East Asia. According to the Singapore lawsuit, Mr. Ting "[S]ent an internal e-mail to Robert Brennan and Todd Morakis 'to the effect that it was acceptable for a trader to request the SOR rate setters that the SOR be set at a specific level.'"

(f) Todd Morakis was the managing director at RBS. According to the Singapore lawsuit, Mr. Morakis "orally confirmed to [Tan] round October [2011] that 'the practice of requesting to change the rate Libor is common in every rate setting environment in the banking industry.'"

(g) Thomas Hayes was a derivatives trader for Citibank. According to an article in the *Financial Times*, Mr. Hayes "attempted to pressure colleagues and employees at other banks involved in the rate-setting process for the Tokyo Interbank Offered Rate, or Tibor.'"

(h) Christopher Cecere was the head of G10 trading and sales for Asia at Citibank. The Japanese FSA found that Mr. Cecere "and another Citigroup trader engaged in 'seriously unjust and malicious' conduct by asking bankers to alter data they submitted while setting a benchmark Japanese lending rate."

(i) Brent Davies was a sterling trader at RBS in London. According to an article in *Businessweek*, Mr. Davies was named in the May 2011 Elliott Affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the Affidavit, Trader A explained to Mr. Davies who his collusive contacts were and how he had and was going to manipulate Yen LIBOR. Trader A also communicated his trading positions, his desire for certain movement in Yen LIBOR and gave instructions for Mr. Davies' trader to get RBS to make Yen LIBOR submissions consistent with Trader A's wishes. Mr. Davies trader acknowledged these communications and confirmed that he would follow through. Trader A and Mr. Davies also entered into transactions that aligned their trading interest in regards to Yen LIBOR.

(j) Will Hall was a derivatives trader at RBS in London. He was named in May 2011 Elliott Affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the Affidavit, Trader A communicated to Mr. Hall his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get RBS to make Yen LIBOR submissions consistent with his wishes, and Mr. Hall agreed to do this.

(k) Paul Glands was a derivatives trader with JP Morgan. He was named in the May 2011 Elliott Affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the affidavit, Trader A communicated to Mr. Glands his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get JP Morgan to make Yen LIBOR submissions consistent with his wishes, and Mr. Glands agreed to do so.

(l) Stewart Wiley was a derivatives trader with JP Morgan. He was named in the May 2011 Elliott Affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the Affidavit, Trader A communicated to Mr. Wiley his trading

positions, his desire for a certain movement in Yen LIBOR and instructions to get JP Morgan to make Yen LIBOR submissions consistent with his wishes, and Mr. Wiley agreed to do so.

(m) Guillaume Adolph was a derivatives trader at Deutsche Bank. He was named in the May 2011 Elliott Affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the Affidavit, Trader A communicated to Mr. Adolph his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get JP Morgan to make Yen LIBOR submissions consistent with his wishes, and Mr. Adolph agreed to do so.

(n) Peter O'Leary was a derivatives trader at HSBC. He was named in the May 2011 Elliott Affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the affidavit, Mr. O'Leary was instructed by Trader A at UBS "to get HSBC to make Yen LIBOR submissions consistent with his wishes."

(o) Andrew Hamilton is a former investment advisor at RBS in London. According to an article in *Bloomberg*, Mr. Hamilton was dismissed by RBS on October 21, 2011 and now is listed as inactive on the U.K. Financial Services Authority's register of people approved to work in the industry.

(p) Neil Danzinger is a former trader at RBS in London. According to an article in *Bloomberg*, Mr. Danzinger was dismissed by RBS on October 21, 2011 and now is listed as inactive on the U.K. Financial Services Authority's register of people approved to work in the industry.

(q) Brian McAppin was Citigroup's brokerage head in Japan. According to an article in the *Wall Street Journal*, the Japanese investigation found that he "overlooked" alleged attempts by the two traders to influence interest rates despite "recognizing these actions."

(r) Christian Schluep was a trader Mitsubishi's London office. According to an article in *Reuters*, the trader previously employed at Rabobank and part of the investigations by the FSA. On July 10, 2012, Mitsubishi suspended the trader for acts that occurred at Rabobank.

(s) Paul Robson was a trader Mitsubishi's London office. According to an article in *Reuters*, the trader previously employed at Rabobank and part of the investigations by the FSA. On July 10, 2012, Mitsubishi suspended the trader for acts that occurred at Rabobank.

155.   After publication of the settlement terms and facts, Marcus Agius resigned as Barclays' chairman on July 2, 2012. In a statement announcing his resignation, Agius stated that "last week's events – evidenced as they do unacceptable standards of behavior within the bank – have debt a devastating blow to Barclays' reputation. As chairman, I am the ultimate guardian of the bank's reputation. Accordingly, the buck stops with me and I must acknowledge responsibility by standing aside."

## FRAUDULENT CONCEALMENT

156.   By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, conspired and engaged in secret and surreptitious activities in order to manipulate LIBOR.

157.   Defendants fraudulently concealed their participation in their conspiracy to manipulate LIBOR by, among other things, engaging in secret meetings and communications in furtherance of the conspiracies. Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

158. Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy and manipulation.

159. Defendants' actions in fraudulently concealing their illegal conspiracy caused the BBA, the organization that owns and administers LIBOR, to issue a number of statements defending the integrity of LIBOR.

160. For instance, in a statement issued in May 2008, in response to published reports suggesting that Defendants had artificially suppressed LIBOR as evidenced by the decoupling of LIBOR from the CDS market, a BBA spokeswoman announced that there was "no indication" that the default-insurance market provides a more accurate picture of banks' borrowing costs than LIBOR.

161. In June 2009, John Ewan, director of the BBA, represented that LIBOR was "not a false signal to the markets." Even as recently as March 2011, in response to UBS's disclosure that it was the subject of government investigations in connection with Defendants' suppression of LIBOR, the BBA issued a statement characterizing LIBOR as an "accurate and reliable benchmark[]."

162. Plaintiff and members of the Class were lulled into believing that the returns on their LIBOR-Based derivatives were the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

163. Despite due diligence by Plaintiff and members of the class, they were not able to uncover any likelihood that there had been a violation of the antitrust laws until the public disclosures in 2011 regarding various governmental investigations

164.    Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiff and members of the Class from suing them for the anti-competitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## DEFENDANTS' ANTITRUST VIOLATIONS

165.    Beginning at least as early as August 1, 2007, and continuing until at least the date of the filing of the Complaint, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, suppress and stabilize LIBOR and thus the prices and rates of return on LIBOR-Based derivatives sold by them.

166.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress and otherwise make artificial the price of LIBOR-Based derivatives. These activities included the following:

(a)    Defendants participated in meetings and/or conversations to unlawfully discuss their reporting of their borrowing rates to Reuters for calculation of the daily LIBOR;

(b)    Defendants agreed during those meetings and conversations to unlawfully report their borrowing rates to Reuters for calculation of LIBOR in order to drive down LIBOR and otherwise to depress or make artificial LIBOR;

(c)    Defendants signaled to one another their intention to depress or otherwise make artificial LIBOR and colluded with one another in achieving this unlawful and anticompetitive purpose; and

(d)     Pursuant to such an unlawful conspiracy in restraint of trade, Defendants knowingly and collusively traded in order to depress or otherwise make artificial the price of LIBOR-Based derivatives.

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFF AND THE CLASS

167.    Defendants' anticompetitive conduct had severe adverse consequences on competition in that Plaintiff and other members of the Class who traded in LIBOR-Based derivatives during the Class Period were trading at artificially determined prices that were made artificial as a result of Defendants' unlawful conduct.  As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

## COUNT ONE

## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

168.    Plaintiff incorporates by reference the preceding allegations.

169.    Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

170.    During the Class Period, Defendants controlled what LIBOR rate would be reported and therefore controlled the rates of return on LIBOR-Based derivatives sold by them.

171.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and stabilized LIBOR and thus the prices and rates of return on LIBOR-Based derivatives sold by them.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

172.    Defendants' conspiracy, and resulting impact on the market for LIBOR-Based derivatives, occurred in or affected interstate and foreign commerce.

173.    As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

174.    Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## **RELIEF SOUGHT**

Accordingly, Plaintiff demands relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

C.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.    That Plaintiff and the Class recover damages, as provided under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

E.    That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

F.     That the Court direct such further relief it may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Dated: July 30, 2012                          **LITE DEPALMA GREENBERG, LLC**

                                              By:  _____
                                                   Joseph J. DePalma
                                                   Katrina Carroll
                                                   Steven J. Greenfogel
                                                   Mayra V. Tarantino (MT2389)
                                                   Two Gateway Center, Suite 1201
                                                   Newark, New Jersey 07102
                                                   Tel: (973) 623-3000
                                                   Fax: (973) 623-0858
                                                   (jdepalma@litedepalma.com)
                                                   (kcarroll@litedepalma.com)
                                                   (sgreenfogel@litedepalma.com)
                                                   (mtarantino@litedepalma.com)

                                                   **HEINS MILLS & OLSON, P.L.C.**
                                                   Vincent J. Esades
                                                   Dylan McFarland
                                                   310 Clifton Avenue
                                                   Minneapolis, MN 55403
                                                   Tel: (612) 338-4605
                                                   Fax: (612) 338-4692
                                                   (VEsades@heinsmills.com)
                                                   (DMcFarland@heinsmills.com)

                                                   **FREED KANNER LONDON & MILLEN LLC**
                                                   Steven A. Kanner
                                                   William H. London
                                                   2201 Waukegan Road, Suite 130
                                                   Bannockburn, IL 60015
                                                   Tel: (224) 632-4500
                                                   Fax: (224) 632-4521
                                                   (skanner@fklmlaw.com)
                                                   (blondon@fklmlaw.com)

                                                   **OLLER & HARDING, L.L.C.**
                                                   Richard L. Oller

35 Green Pond Road
Rockaway, NJ 07866
Tel: (973) 983-7020
Fax: (973) 983-7030
(rlo@jtmase.com)

**_Attorneys for Plaintiff_**